UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| MILTON DEUTSCH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HIRERIGHT HOLDINGS CORPORATION, GUY P. ABRAMO, THOMAS M. SPAETH, JAMES CAREY, MARK DZIALGA, PETER FASOLO, JAMES MATTHEWS, PETER MUNZIG, JILL SMART, JOSH FELDMAN, and LISA TROE,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Milton Deutsch ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding HireRight Holdings Corporation ("HireRight" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all those who purchased or otherwise acquired HireRight securities pursuant and/or traceable to the Offering Documents (defined below) issued in connection with HireRight's October 2021 initial public offering (the "IPO" or "Offering"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act").

2. HireRight provides technology-driven workforce risk management and compliance solutions to a customer base characterized as a "diverse set of organizations, from large-scale multinational businesses to small and medium-sized businesses, across a broad range of industries." The Company offers background screening, verification, identification, monitoring, and drug and health screening services for customers under the HireRight brand name and boasts a purportedly "robust pipeline of opportunities developed by [its] sales team to continue to attract new customers and take share in the market."

3. On October 6, 2021, HireRight filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after an amendment, was declared effective by the SEC on October 28, 2021 (the "Registration Statement").

4. On November 1, 2021, HireRight filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

5. That same day, pursuant to the Offering Documents, HireRight's common stock began publicly trading on the New York Stock Exchange ("NYSE") under the ticker symbol HRT.

6. Pursuant to the Offering Documents, HireRight issued approximately 22. million shares of its common stock to the public at the Offering price of $19.00 per share for proceeds to

the Company of approximately $399 million after applicable underwriting discounts and commissions, and before expenses.

7. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) HireRight was exposed to customers with significant employment and hiring risk and the Company derived greater revenue growth from existing client hiring than from new client hiring; (ii) as a result, the Company's revenue growth was unsustainable to the extent that it relied on the stability of its current customers' hiring and/or the profitability of securing new customers; (iii) accordingly, HireRight had overstated its post-IPO business and/or prospects; and (iv) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. On January 19, 2023, Stifel, a brokerage and investment banking firm, downgraded HireRight's stock from a Hold to a Buy, prompting several market analysts to issue publications discussing the downgrade. For example, *Seeking Alpha* reported that Stifel found HireRight to be exposed to large technology firms where there is more acute employment and hiring risk, and that more of the Company's growth comes from existing client hiring than from new.

9. On this news, HireRight's stock price fell $0.88 per share, or 7.5%, to close at $10.75 per share on January 19, 2023.

3

Case 3:24-cv-00371     Document 1     Filed 04/01/24     Page 3 of 19 PageID #: 3

10. At the time of this Complaint, HireRight's common stock continue to trade below the $19.00 per share IPO price.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of HireRight's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 22 of the Securities Act (15 U.S.C. § 77v).

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)). HireRight is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16. Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired HireRight securities pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant HireRight is a Delaware corporation with principal executive offices located at 100 Centerview Drive, Suite 300, Nashville, Tennessee 37214. HireRight's securities trade on the NYSE under the ticker symbol "HRT."

18.     Defendant Guy P. Abramo ("Abramo") was at the time of the IPO the Company's President and Chief Executive Officer. Defendant Abramo reviewed, contributed to, and signed or caused to be signed the Registration Statement.

19.     Defendant Thomas M. Spaeth ("Spaeth") was at the time of the IPO the Company's Chief Financial Officer. Defendant Spaeth reviewed, contributed to, and signed or caused to be signed the Registration Statement.

20.     Defendant James Carey ("Carey") was at the time of the IPO a Director of the Company. Defendant Carey reviewed, contributed to, and signed or caused to be signed the Registration Statement.

21.     Defendant Mark Dzialga ("Dzialga") was at the time of the IPO a Director of the Company. Defendant Dzialga reviewed, contributed to, and signed or caused to be signed the Registration Statement.

22.     Defendant Peter Fasolo ("Fasolo") was at the time of the IPO a Director of the Company. Defendant Fasolo reviewed, contributed to, and signed or caused to be signed the Registration Statement.

23.     Defendant James Matthews ("Matthews") was at the time of the IPO a Director of the Company. Defendant Matthews reviewed, contributed to, and signed or caused to be signed the Registration Statement.

24. Defendant Peter Munzig ("Munzig") was at the time of the IPO a Director of the Company. Defendant Munzig reviewed, contributed to, and signed or caused to be signed the Registration Statement.

25. Defendant Jill Smart ("Smart") was at the time of the IPO a Director of the Company. Defendant Smart reviewed, contributed to, and signed or caused to be signed the Registration Statement.

26. Defendant Josh Feldman ("Feldman") was at the time of the IPO a Director of the Company. Defendant Feldman reviewed, contributed to, and signed or caused to be signed the Registration Statement.

27. Defendant Lisa Troe ("Troe") was at the time of the IPO a Director of the Company. Defendant Troe reviewed, contributed to, and signed or caused to be signed the Registration Statement.

28. Defendants Abramo, Spaeth, Carey, Dzialga, Fasolo, Matthews, Munzig, Smart, Feldman, and Troe are collectively referred to herein as the "Individual Defendants."

29. The Individual Defendants ran the Company as hands-on executives, managers and/or directors, overseeing HireRight's operations, finances, and business. The Individual Defendants made the materially false and misleading statements described herein and each had intimate knowledge about core aspects of HireRight's financial and business operations. The Individual Defendants were also intimately involved in deciding which disclosures would be made by HireRight. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants,

because of their positions at HireRight, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, institutional and individual investors, and industry experts and/or practitioners at conferences and other events. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## SUBSTANTIVE ALLEGATIONS

### Background

30. HireRight provides technology-driven workforce risk management and compliance solutions to a customer base characterized as a "diverse set of organizations, from large-scale multinational businesses to small and medium-sized businesses, across a broad range of industries." The Company offers background screening, verification, identification, monitoring, and drug and health screening services for customers under the HireRight brand name and boasts a purportedly "robust pipeline of opportunities developed by [its] sales team to continue to attract new customers and take share in the market."

31. On October 6, 2021, HireRight filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after an amendment, was declared effective by the SEC on October 28, 2021.

32. On November 1, 2021, HireRight filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

33. That same day, pursuant to the Offering Documents, HireRight's common stock began publicly trading on the NYSE under the ticker symbol HRT.

34. Pursuant to the Offering Documents, HireRight issued approximately 22. million shares of its common stock to the public at the Offering price of $19.00 per share for proceeds to the Company of approximately $399 million after applicable underwriting discounts and commissions, and before expenses.

**Materially False and Misleading Statements Issued in the Offering Documents**

35. In providing an overview of the Company, the Offering Documents stated, in relevant part:

> HireRight is a leading global provider of technology-driven workforce risk management and compliance solutions. We provide comprehensive background screening, verification, identification, monitoring, and drug and health screening services for more than 40,000 customers across the globe. We offer our services via a unified global software and data platform that tightly integrates into our customers' human capital management ("HCM") systems enabling highly effective and efficient workflows for workforce hiring, onboarding, and monitoring. In 2020, we screened over 20 million job applicants, employees and contractors for our customers.
>
> We believe that workforce risk management and compliance is a mission-critical function for all types of organizations. The rapidly changing dynamics of the global workforce are creating increased complexity and regulatory scrutiny for employers, bolstering the importance of the solutions we deliver. *Our customers are a diverse set of organizations, from large-scale multinational businesses to small and medium-sized businesses ("SMB"), across a broad range of industries, including transportation, healthcare, technology, business and consumer services, financial services, manufacturing, education, retail and not-for-profit*. Hiring requirements and regulatory considerations can vary significantly across the different types of customers, geographies and industry sectors we serve, creating demand for the extensive institutional knowledge we have developed from our decades of experience. *Our value proposition is evident in our long-standing customer relationships that we develop, with an average customer tenure of nine years*.
>
> Our technology platform comprises a versatile set of software-based systems and databases that work together in support of the specific risk management and compliance objectives of any organization, regardless of size. Our

customers and applicants access our global platform through HireRight Screening Manager and HireRight Applicant Center, respectively. Our platform also seamlessly integrates through the HireRight Connect application programming interface ("API") with nearly all third-party HCM systems, including Workday, Service Now, Oracle, and SAP, providing convenience and flexibility for our customers. Additionally, backgroundchecks.com serves as our system for customers that prefer a self-service solution, including many of our SMB customers. All of these systems leverage our extensive access and connectivity to employee and job applicant data. We further differentiate ourselves in the market with a number of proprietary databases including broad criminal records databases and sector-specific databases serving the transportation, retail, and gig economy markets. We also possess one of the industry's largest criminal conviction databases. We are committed to continuing to invest in our software and data platform to provide additional insights for our customers, support the innovation of new services, and enable further automation of our service delivery.[1]

36. Further, in discussing the Company's value proposition, the Offering Documents stated, in relevant part:

- *Comprehensive results*. Our services are recognized for their thoroughness and depth of coverage.

- *Global reach*. Our global reach provides a unified approach to background screening and streamlined access for multinational customers across their organizations.

- *Unified, global platform*. Our unified global platform provides access to the full breadth of our services through a single integrated service offering, regardless of geography.

- *Flexible delivery*. Our platform scales to meet the needs of global enterprises and SMBs alike, with program managed and self-service solutions to match our customers' preferences.

- *Breadth and depth of data access*. Our proprietary databases incorporate information from a wide range of sources to power our services.

- ***Sector-specific expertise. Our industry experience and long-standing customer relationships enable sector-specific solutions to fit the needs of customers across different end-markets***.

---

[1] All emphases included herein are added unless otherwise indicated.

- *Strength in integrations*. Our integrations with all major HCM systems make us a partner of choice for seamless interoperability with customer systems.

- *Rapid turnaround*. Our technology combines comprehensiveness with speed, delivering high quality results to our customers quickly and efficiently.

37. In addition, in discussing the Company's market opportunity, the Offering Documents stated, in relevant part:

> We operate in a large, fragmented and growing global market focused on workforce risk management and compliance solutions. Employment background screening is a critical, highly complex employer need and is a core component of this overall market opportunity. According to Allied Market Research, the global background screening services market is expected to be $5.1 billion in total revenue in 2021. This market is projected to grow at a compound annual growth rate of approximately 9% to reach $7.6 billion in 2026. These figures reflect the outsourced portion of the global background reporting services market. We believe the total market size, inclusive of services currently being performed in-house substantially exceeds these figures.
>
> We believe our addressable market has significant growth potential as our service offering will continue to evolve to address the dynamic and changing needs of our customers. The growth in our addressable market could be driven by services we currently provide, such as ongoing monitoring or by services adjacent to our current offering, such as employee assessment, credentialing or biometrics. We believe our market leadership in background screening as well as our scale, global presence, and differentiated technology platform will continue to enable us to penetrate additional facets of the vast workforce risk management and compliance market.
>
> We believe our long-term growth expectations for our market are supported by a number of key secular demand drivers:
>
> ***
>
> - *Secular trend towards greater employment velocity*: Employees are changing jobs at an increasing rate with over 20% of working Americans changing jobs each year according to the U.S. Bureau of Labor Statistics. A key driver of this trend are younger "Millennial" employees, who have a median tenure at a single organization of less than 3 years. Increased velocity of job changes drives greater need for our services.

38. Next, in discussing the Company's competitive strengths, the Offering Documents stated, in relevant part:

*Market leader with established scale, global presence and expansive capabilities*

We are among the largest providers in the workforce risk management and compliance services market in terms of revenue, and the number of competing providers of comparable scale, reach, and capabilities is limited. ***Our size and expansive geographic presence, operating from offices across North America, Europe, Asia, and Australia, allow us to deliver truly global insights and a differentiated level of localized, personal support to over 40,000 customers***. Our services are available across the globe with built-in language capabilities and significant knowledge and support around local market regulations and cultural norms. Our global footprint and scale and geographic presence provide a competitive advantage in winning business with large, multinational customers. Moreover, our scale enhances our breadth of data access, which is critical to the reliability of our services.

***

*Deep sector expertise across a large, diversified and loyal customer base*

Our multi-decade track record as a market leader has allowed us to develop entrenched relationships with a wide range of blue-chip customers in various end markets. Our customer base varies widely in terms of both industry and size – from large, multi-national enterprises to SMB – and is diversified with no single customer representing more than 7% of annual revenue and our top 10 customers contributing less than 14% of annual revenue, in the aggregate, in 2020. During the six months ended June 30, 2021, no single customer represented more than 4% of our revenue and our top 10 customers contributed less than 12% of our revenue in the aggregate. Our long-standing customer relationships have further improved our ability to provide differentiated, industry specific solutions based on a deep understanding of the nuances of our customers' industries and pertinent regulatory requirements. For example, for our customers in the transportation industry, our services integrate specific commercial licensing requirements, a purpose built "Driver Center" to provide streamlined communication and easy access to support for applicant drivers, and our DAC Employment History File. We believe the breadth and quality of our sector-specific solutions support our differentiated value proposition to our customers. As a result, we have been highly successful in renewing our largest, enterprise customer engagements which have an average tenure of nine years.

39. Finally, in discussing the Company's growth strategies, the Offering Documents stated, in relevant part:

*Drive new customers and expand our existing customer relationships*

We believe that we have a technology platform and suite of services that enable us to provide differentiated results for our customers. Our customer success is evident in the Company achieving its highest year of new contract bookings in 2020 despite the global pandemic and with strong momentum year-to-date in 2021 with volume and orders reaching levels before the COVID-19 pandemic. We have a robust pipeline of opportunities developed by our sales team to continue to attract new customers and take share in the market. In addition to new customers, we also intend to drive growth through increasing average order size across our customer base, by expanding our customer relationships with incremental adoption of our services, along with the continued introduction of new and innovative services. Together, the momentum in new customer wins and growth in average order size provide significant visibility into our near-term organic growth.

*Continue to penetrate and expand with high-growth, high-velocity customers*

We believe our alignment to industry verticals with favorable growth and hiring characteristics provides a tailwind to our growth trajectory. In particular, we are a market leader in the transportation, healthcare and financial services sectors which all benefit from being highly regulated and having large employee bases with rapid hiring velocity.

We will continue to innovate to maintain our leadership position and capitalize on underlying growth trends across our current end markets, while aggressively targeting expansion in those industries that offer the strongest demand characteristics for our services. These characteristics primarily concern the end-market's workforce size and expected growth, hiring velocity and turnover, level of regulatory and other requirements such as the relative importance of reputational risk management, and expected levels of background screening service adoption, among others. We have identified three key end markets as significant opportunities for future expansion:

- *Gig economy*: Employment dynamics in the gig economy result in high rates of workforce churn and a distinctive, loosely associated labor force which generates new and increased demands for background screening and compliance services. We have built significant momentum in this sector with the addition of key new customers and the recent implementation of our proprietary database for the transportation network, ride-sharing, and delivery driver markets. We intend to leverage our leadership in this sector to expand our presence and continue to capitalize on the gig economy's growth.

- *Financial services*: We are currently a leader in financial services internationally and will look to leverage our experience and global customer relationships to further penetrate the U.S. market. The U.S. financial

12

services end market carries a high regulatory burden, employs a large proportion of the U.S. labor force and has a rapid hiring velocity, which are attractive characteristics for our services.

- *Small and medium-sized business*: Significant "white space" exists in the SMB market, representing approximately half of total U.S. employment according to the U.S. Bureau of Labor Statistics. We plan to target this market primarily through our backgroundchecks.com platform, which provides a self-service solution preferred by many SMB customers. We see significant room for continued expansion as we execute on our marketing strategy, delivering our transparent pricing model and pre-packaged solutions specific to the needs of this market.

40. The statements referenced in ¶¶ 35-39 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) HireRight was exposed to customers with significant employment and hiring risk and the Company derived greater revenue growth from existing client hiring than from new client hiring; (ii) as a result, the Company's revenue growth was unsustainable to the extent that it relied on the stability of its current customers' hiring and/or the profitability of securing new customers; (iii) accordingly, HireRight had overstated its post-IPO business and/or prospects; and (iv) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

41. On January 19, 2023, Stifel, a brokerage and investment banking firm, downgraded HireRight's stock from a Hold to a Buy, prompting several market analysts to issue publications discussing the downgrade. For example, *Seeking Alpha* reported that "HireRight

Holdings [fell] after Stifel downgrade[d] on potential impact to revenue," and stated, in relevant part:

- Workforce risk management and compliance solutions company HireRight Holdings (HRT) was down ~11% after Stifel downgraded the stock, considering a potential impact to revenue numbers.

- HRT was lowered to Hold from Buy at Stifel, with a price target of $12.00.

- The shares are 3% away from the target price, and the company is most exposed to large technology firms within the group, where there is more acute employment/hiring risk, according to Stifel analysts.

- Also, the analysts believe that more of the company's growth comes from existing client hiring than from new, and that is why the analysts expect more impact to the revenue numbers.

- The company is estimated to come out with expectations for a more significant, mid-to-high-single-digit organic revenue decline in 2023.

42. On this news, HireRight's stock price fell $0.88 per share, or 7.5%, to close at $10.75 per share on January 19, 2023.

43. At the time of this Complaint, HireRight's common stock continue to trade below the $19.00 per share IPO price.

44. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of HireRight's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

45. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired HireRight securities in its IPO or purchased HireRight securities thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby. Excluded from the Class are

Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

46. The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities have actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by HireRight or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

50. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Securities Act was violated by Defendants as alleged herein;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of HireRight securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

52. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

53. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

54. The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

55. HireRight is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

56. As issuer of the shares, HireRight is strictly liable to Plaintiff and the Class for the misstatements and omissions.

57. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

58. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

59. Plaintiff acquired HireRight shares pursuant and/or traceable to the Offering Documents for the IPO.

60. Plaintiff and the Class have sustained damages. The value of HireRight securities has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Individual Defendants)**

61. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

62. This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

17

Case 3:24-cv-00371   Document 1   Filed 04/01/24   Page 17 of 19 PageID #: 17

63. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of HireRight within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause HireRight to engage in the acts described herein.

64. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

65. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2024                                                Respectfully submitted,

                                                                              */s/Paul Kent Bramlett*
                                                                              BRAMLETT LAW OFFICES
                                                                              PAUL KENT BRAMLETT
                                                                              TN SUP CT #7387/MS SUP CT #4291

ROBERT PRESTON BRAMLETT
TN SUP CT #25895
40 Burton Hills Blvd., Suite 200
P. O. Box 150734
Nashville, TN 37215
Telephone: 615.248.2828
Facsimile: 866.816.4116
PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

POMERANTZ LLP
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*